Michael X. HURLEY, Plaintiff,

v.

Benjamin J. WARD, Commissioner of the Department of Correctional Services, and Joseph Keenan, Director of Special Housing Units (Punitive Segregation), Individually and in their official capacities, Defendants.

No. 77 Civ. 3847.

United States District Court,
S. D. New York.

April 11, 1978.

Lanny Earl Walter, Daniel J. Steinbock, Prisoners' Legal Services of New York, Albany, N. Y., for plaintiff.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City, for defendants, Paul E. Dahlman, Deputy Asst. Atty. Gen., New York City, of counsel.

OPINION

ROBERT L. CARTER, District Judge.

*The Issue and Facts*

This is a motion for preliminary injunction brought by plaintiff Michael X. Hurley,

---

an inmate in the New York State Correction System. The action is brought pursuant to 42 U.S.C. § 1983. Plaintiff seeks to enjoin state correctional officers from routinely subjecting him to a strip-frisk search in the absence of probable cause to believe that he has concealed contraband in his body. The strip-frisk search requires an inmate, after taking off all his clothes in the presence of the officers, to lift his testicles and bend over and spread his buttocks to show his anus to the officers; to open his mouth and stick out his tongue; and to hold up his feet while the inmate's back is turned to the officer. Plaintiff seeks, moreover, to enjoin the correctional officers from subjecting him to the kind of objectionable search indicated even where probable cause exists since there are alternative and less demeaning methods available for detecting contraband and because of past abuses inflicted upon plaintiff.

The matter was heard on December 6, 7, and 8, 1977, and January 12, and 13, 1978. Plaintiff testified and described his own experiences. Two other inmates who had witnessed plaintiff being strip searched on several occasions also related what they had seen. Video tape recordings of the strip search procedures involving plaintiff being forceably strip searched at Great Meadows Correctional Facility on October 12 and October 26, 1977, were shown. Harvey Alter, the present Director of the City of New York Board of Correctional Institutional Compliance & Development Unit, testified as an expert witness on plaintiff's behalf. Finally, the state offered the testimony of two correctional officers assigned to its Arthur Kill Correctional Facility, Staten Island, New York.

The strip-frisk search at issue here is defined in Title 7, New York Code, Rules & Regulations, Section 1020.5(b) as follows:

"A *strip frisk* means a search of an inmate's person and his clothes after the inmate has removed all his clothing. The search includes a thorough inspection of the clothing and a close visual inspection of the inmate's person, including body cavities. If there is reasonable cause to believe contraband has been concealed in a body cavity, the inmates shall be immediately examined and/or x-rayed by a facility health staff member."

Sections 1020.25(b) and (c), then provide that an inmate in special housing is to be strip frisked upon leaving the special housing unit if he is to leave the facility for any reason, and is always to be strip frisked upon his return to the unit.

Department of Correctional Services Directive 4910 (P–1) justifies this practice as sound correctional policy. That directive provides in pertinent part that:

"1. Searching an inmate's person is a sound correctional practice and a necessary element of contraband control. The employee conducting this type of search must assure its thoroughness and not offend the dignity of the inmate being searched.

2. The three types of searches of an inmate's person which are authorized are as follows:

.    . .    .      .      .

c. A Strip Frisk may be made on inmates leaving a visiting area in a maximum or medium security facility, going to or coming from a psychiatric observation unit, returning from release programs, being transferred or received from another facility or jurisdiction, going to or returning from court, hospital, outside medical care or consultation, funeral and such leave, and whenever there are reasonable grounds to believe the inmate is in possession of contraband which may not be detected by a 'pat frisk.' The strip frisk is to be performed in a manner that is least degrading to all parties concerned."

The procedure, as described by both inmates and correctional officers, was for the inmate to disrobe in front of the guards, spread his fingers, lift his arms, open his

mouth and wag his tongue, lift his testicles and turn his back to the guards, raise his feet, bend over and spread the cheeks of his buttocks. The inmates say that when they raise their feet they have to wiggle their toes (the correctional officer testifying for the state said they merely had to raise their feet). The inmates state they have to run their hands through their hair, but the correctional officer says the guards do that. The inmates' version of toe wiggling seems more in keeping with this degrading pantomime, required in the name of security, as does requiring the inmate to run his hand through his hair.

The video tape was most revealing. Plaintiff is shown after he has been led out of his cell, with shackles on his ankles and with his hands shackled to a bar around his waist. The shackles are removed for his strip-frisk search. Afterwards, he is permitted to dress, the shackles are locked in place around his ankles, and his hands are shackled to a bar at his waist, and he leaves the premises to go, in the instances shown, to court. The record does not disclose whether the shackles are removed in the courtroom, but I assume that they are. He is under the strict surveillance of the correctional officer during his time away from prison. When his courtroom appearance is over, again the record is unclear, but I assume the ankle chains and hand shackles are again fitted on the inmate and he returns to prison as he left—fully shackled. On arrival, the shackles are removed, and he is again subjected to a strip frisk. Finally, he is reshackled and taken back to his cell.

Plaintiff's civil rights contention is directed specifically to the testicle lifting and buttocks spreading elements of the strip search. When required to undergo this procedure, plaintiff consistently refuses to cooperate and is forceably made to comply.

*Discussion*

The standard for granting a motion for a preliminary injunction is probable success on the merits and irreparable injury. *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.,* 476 F.2d 687, 692 (2d Cir. 1973). In addition, the court may consider whether a sufficiently serious question going to the merits has been raised to make it a fair ground for litigation and whether the balance of hardships weighs in favor of the party seeking relief. *Id.* at 692–93, *quoting Checker Motors Corp. v. Chrysler Corp.,* 405 F.2d 319, 323 (2d Cir.), *cert. denied,* 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969).

■ Plaintiff is a sentenced inmate, serving a term for a serious infraction of the law. Moreover, he has been confined to a special housing unit because of findings by the Adjustment Committee that he violated the facility regulations. He is under indictment for assaulting a guard, and is presently serving a term of 25 years to life. We deal, therefore, with an inmate about whom society and the correction officers have reason to hold security concerns. Accordingly, the restricted parameters of judicial intervention in respect to the conditions of plaintiff's incarceration must be strictly observed. The Constitution does not require that persons of plaintiff's class be provided with all the amenities of the outside world. *See Newman v. Alabama,* 559 F.2d 283 (5th Cir. 1977). Moreover, it must be recognized that "courts are ill equipped to deal with the increasingly urgent problems of prison administration . . . ." *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). Yet, it is also recognized that prisoners, even dangerous ones, are entitled to some basic consideration which civilized society accords to members of the human race. *See Newman v. Alabama, supra,* 559 F.2d at 286.

The justification put forward for the strip-frisk search is to prevent contraband from being introduced into the prison. The testimony adduced by the state showed that one guard, who had been a correction officer for 8 years and 7 months, had discovered on one strip-frisk search a marijuana cigarette taped behind the testicles of an

inmate; in another case, he had found a band aid enclosing a $10 bill taped to the inside of a man's leg, and in a third case, he had discovered money hidden in an inmate's jock strap. The jock strap incident can immediately be put to one side—the discovery of the money could have been accomplished by a simple search of the man's clothing after he had undressed. The incident involving contraband being taped to the inside of the inmate's leg was also discoverable by less intrusive means, such as a close inspection of the inmate's naked body. Only in the case of the marijuana cigarette enclosed in a band aid taped behind the inmate's testicles was there any real possibility that a simple, close look at the inmate's naked body would not reveal the contraband. The one possibility in the 8 years and 7 months experience of a guard who must have participated in innumerable strip-frisk searches is very little proof of the need for a procedure which is as degrading and dehumanizing to both inmates and guards as that involved here.

An individual who is convicted of a crime and imprisoned does not lose all claim to the protections of the Constitution. While he does forfeit considerable portions of the rights available to those outside the prison walls, that surrender is not total, and some residuum of his constitutional guarantees survives. *See Bonner v. Coughlin,* 517 F.2d 1311, 1316 (7th Cir. 1975) (Stevens, J.). Indeed, it seems to have become accepted doctrine that prisoners retain all of their constitutional rights except those that must be impinged upon for purposes of security and rehabilitation. *James v. Wallace,* 382 F.Supp. 1177, 1180 (M.D.Ala.1974), *citing Jones v. Wittenberg,* 323 F.Supp. 93, 98 (N.D.Ohio 1971), *aff'd sub nom., Jones v. Metzger,* 456 F.2d 854 (6th Cir. 1972). It is clear that a prisoner must submit to reasonable discipline. *Blake v. Pryse,* 315 F.Supp. 625, 626 (D.Minn.1970), *aff'd,* 444 F.2d 218 (8th Cir. 1971) (per curiam). "Yet, few will dispute that, whatever the circumstances, the existence of a realm in which privacy is safeguarded is fundamental to decent treat-ment of an inmate. . . . Indeed, every effort should be made to preserve those conditions which foster human dignity." *Wolfish v. Levi,* 573 F.2d 118 at 131 (2d Cir. 1978).

█ Whenever a prisoner leaves the facility, he is apparently put into leg irons, and his hands are shackled to a bar fastened around his waist. The inmate, while away from the institution, remains under the watchful eye of the guard who accompanies him. There was no effort to justify strip-frisk searches on grounds that the prisoner could somehow conceal a weapon behind his testicles or in his anus. The chief concern apparently is that unless strip-frisk searches are permitted, inmates will be able to smuggle money and narcotics into the prison. Yet, only one incident appears in the record which conceivably provides any support for the state's contentions in this regard.

Basic civilized standards require that prison inmates be accorded at least some minimal right to privacy. Arbitrary and routine invasions of privacy in the name of security create needless tensions and hostility among the affected inmates. As with all problems in our society, unhappily these tensions become exacerbated when, as here, the correction officials enforcing the regulations or restrictions are white and the inmates are black.

The whole challenged procedure appalls. Inmates are required to open their mouths, wag their tongues, turn and show the bottoms of their feet and spread their toes—a procedure akin to displaying slaves for auction, cattle for market, and animals for sale. The ultimate degradation is the required lifting of the testicles and the bending over to spread the buttocks.

There are, of course, a number of cases which have found no constitutional violation in these practices and have refused to enjoin them on the grounds that security considerations warrant them. *See, e.g., Daughtery v. Harris,* 476 F.2d 292 (10th

Cir.), *cert. denied*, 414 U.S. 872, 94 S.Ct. 112, 38 L.Ed.2d 91 (1973); *Hodges v. Klein*, 412 F.Supp. 896 (D.N.J.1976); *Giampetruzzi v. Malcolm*, 406 F.Supp. 836 (S.D.N.Y.1975). The argument accepted in those cases, however, cannot withstand close scrutiny. The record is devoid of a single incident when weapons were uncovered by these searches. In addition, it must be remembered that plaintiff here seeks very limited relief. He is not requesting that he not be searched, or that he not be required to strip before the guards and allow them a visual inspection of his naked body. Nor is he requesting that he not be required to open his mouth or show the bottoms of his feet. All that plaintiff seeks is an order enjoining the degrading practice of requiring him to lift his testicles and spread his buttocks—a practice described by our court of appeals as one that "shocks one's conscience." *Wolfish v. Levi, supra*, at 1219.

The irreparable injury which such practices inflict is all but self evident. In *United States ex rel. Wolfish v. Levi*, 439 F.Supp. 114 (S.D.N.Y.1977), *aff'd in relevant part*, 573 F.2d 118 (2d Cir. 1978), Judge Frankel, in commenting on strip searches in a federal prison, which track the practices at issue here, stated that such procedures reveal qualities "that a court might come close to noticing judicially." *Id.* at 146. Those qualities were the unpleasantness, embarrassment and humiliation. "The spreading and lifting of genitalia and the bending over to spread buttocks for anal inspection plunge the reaction to a level of deep degradation and submission. The postures [inmates] are compelled to assume are calculated to trigger, in the officer and inmates respectively, feelings of sadism, terror and incipient masochism that no one alive could have failed to predict." *Id.* at 146–47.

While *Wolfish* dealt with pretrial detainees and prisoners convicted of serious crimes, no distinction was made between the two types of prisoners in barring the practice as a violation of the inmates' constitutional rights. Since there has been nothing on the record in this trial to justify the practice, the probability of success on the merits has been established. Moreover, the institutional practices used in conjunction with the strip searches in *Wolfish* are more lenient than those in this case. There, prisoners are escorted to court in handcuffs. They are not put in leg irons, nor are their hands strapped to a bar at their waists.

This case was brought on an individual basis, but we hold that the practice of requiring prisoners during strip search procedures to lift their genitals and to bend over and spread their buttocks to display their anus violates basic federal civil rights and imposes irreparable injury. Accordingly, the practice is enjoined. The requirement that the inmates disrobe before the guards to allow their body and clothing to be closely inspected is not disturbed. Nor is the state correctional facility barred from conducting a strip-frisk search when there is cause to believe that contraband is being smuggled into the institution. In such cases, however, the correction officials must make a record of the strip search and set forth reasons why they felt it necessary to conduct it. The preliminary injunction is granted.

IT IS SO ORDERED.