Michael X. HURLEY, etc., et al., Plaintiffs,

and

Khalil A. Rahman, etc., et al., Plaintiffs-Intervenors,

v.

Benjamin WARD, et al., Defendants,

and

New York State Inspection, Security, and Law Enforcement Employees, District Council 82, AFSCME, AFL–CIO, etc., Defendants-Intervenors.

Isma'il Abdur RAHIM, Plaintiff,

v.

Thomas A. COUGHLIN, III, et al., Defendants.

Nos. 77 Civ. 3847 (RLC), 78 Civ. 5382 (RLC).

United States District Court, S.D. New York.

Sept. 29, 1982.

Arthur Giacalone, David Leven, Randolph Volkell, Lanny E. Walter, Prisoners' Legal Services of New York, New York City, for plaintiff class and plaintiff Hurley.

Claudia Angelos, Washington Square Legal Services, Inc., New York City, for plaintiffs-intervenors.

William E. Hellerstein, Dori A. Lewis, Amy Rothstein, The Legal Aid Society, Prisoners' Rights Project, New York City, for plaintiff Rahim.

Hon. Robert Abrams, Atty. Gen. of State of N.Y., New York City, for defendants; Daniel Kinburn, Eleanor Janosek Doyle, Richard M. Howard, Deputy Asst. Attys. Gen., New York City, of counsel.

Brian O'Donnell, Rowley & Forrest, Albany, N.Y., for defendants-intervenors.

## OPINION

ROBERT L. CARTER, District Judge.

*The Proceedings*

In 77 Civ. 3847, plaintiff Michael Hurley initially sued *pro se,* pursuant to 42 U.S.C. § 1983, seeking preliminarily to enjoin state prison authorities from subjecting him to strip frisk (body cavity, genital and anal) searches and requesting damages for injuries inflicted by prison guards in the excessive use of force. The motion for preliminary injunction was granted. Although class relief had not been sought, the injunction issued barred strip frisk searches throughout the state prison system except on probable cause. On appeal the injunction as to Hurley was upheld, but the general prohibition was overturned as clearly erroneous. *Hurley v. Ward,* 448 F.Supp. 1227 (S.D.N.Y.) (Carter, J.), *aff'd in part and rev'd in part,* 584 F.2d 609 (2d Cir. 1978). On November 9, 1979, the court's injunction was amended so that it no longer applied to strip frisk searches after contact visits and, at the same time, the court certi-

fied the matter as a class action on behalf of all prisoners in state custody challenging the Department of Correctional Services' strip frisk policies.

Khalil A. Rahman intervened on behalf of all Muslim inmates who challenged the state strip frisk search practices on religious grounds. The Muslim inmates were certified as a subclass who contested the constitutionality of the strip frisk searches as applied to Muslim inmates on grounds that the practice was at variance with the religious tenets of the subclass.

Isma'il Abdur Rahim filed 78 Civ. 5382 in which he challenged the strip frisk search practices as violative of the fourth, eighth and fourteenth amendments and 42 U.S.C. § 1983. Plaintiff is suffering from glaucoma and because of his refusal, for religious reasons, to submit to strip frisk searches he. has had to forgo visits to treating physicians and facilities outside the prison where his condition can be treated adequately.

Defendants in both cases are the Commissioner of the Department of Correctional Services, currently Thomas A. Coughlin, III, and Joseph A. Keenan, Director of Special Housing. In September, 1978, New York State Inspection, Security and Law Enforcement Employees, District Council 82, a union of state correctional officials, were allowed to intervene in 77 Civ. 3847 as a defendant class.

The two cases were consolidated and jointly tried from May 26, 1981 to June 23, 1981, and except for testimony concerning Hurley's damage claim and Rahim's medical needs, the trial was devoted solely to evidentiary proof concerning the strip frisk issue with particularized testimony in respect of its impact on the Muslim subclass.

*The Testimony At Trial*

There were several types of testimony heard during the course of the proceeding. State officials, e.g., Thomas A. Coughlin, III and William Gard, Deputy Commissioner of Correctional Services, explained that the state strip search practices and procedures were enforced to prevent the introduction of contraband into the prisons. While the definition of contraband in a prison environment covers any forbidden, item, it was agreed that for the purposes of these proceedings contraband meant money and drugs. State officials articulated the serious problems which those forms of contraband created when introduced inside prisons.

It was conceded that strip frisk searches were distasteful. The procedures were reviewed in January, 1981, and the review resulted in Directive # 4910 dated January 20, 1981, which supplemented directives # 4901 dated October 13, 1978, and # 4906 dated March 13, 1975. Gard testified that when the policy was reviewed in January, 1981, prison authorities decided to effectuate a policy of performing strip frisk searches affording maximum privacy and physical comfort to the inmate. The purpose of the new directive was to allow the superintendents of each prison discretion in carrying out strip search procedures. Superintendent Wilson Walters of Sing Sing, however, testified that it was his policy to enforce strip searches routinely in all situations.

A large number of inmates testified about their strip search experiences. All found the procedure distasteful. They testified about being forced to submit to strip frisk searches before other inmates and several correction officers, of being strip searched in unheated areas, and of being subjected to ribald comments from correction officers about the size of their genitals and in some cases of being forced to submit to several searches in quick succession. A female inmate testified about being strip searched in a room into which male correction officers could look at will.

One inmate, Abdullah Muhtaqim, testified that on his transfer from the Westchester County Jail to Ossining, he was strip frisk searched on leaving the jail and on arrival at Ossining. After being housed for the night in the special housing unit, he was taken to the receiving room and strip frisk searched. He returned to his cell in special housing, and after ten minutes was taken to the receiving room and again strip frisk

searched in preparation for transfer to Clinton the next day. He was returned to special housing and the next morning strip frisk searched prior to being put on the bus for transfer to Clinton. On arrival at Clinton he was again strip frisk searched (1130–32).[1]

Radwan Omar had a similar experience. On leaving Great Meadow prior to transfer to Downstate, he was strip frisk searched. On arrival at his destination, he was strip frisk searched at the receiving area, then immediately escorted to special housing where he was again strip frisk searched (773–79). He also testified that while at Downstate he saw his attorney at 5:00 P.M. in the visiting room which at the time was closed and empty of inmates. He was strip frisk searched prior to leaving special housing, and was escorted to the visiting area with his hands handcuffed behind his back by the officer who strip frisk searched him. That officer, along with two others, observed the entire visit and the escorting guard strip frisk searched him after the visit and again on his reentry in special housing. (781–87). Miriam Acevedo was subjected to three immediately successive strip frisk searches involving vaginal and rectal digital intrusion on her return to prison from court (177–82).

Michael Hurley testified concerning his strip frisk search experiences and as to facts which form the basis of his claim for damages for injuries inflicted on him by correction officers in the excessive use of force.

The Muslim inmates testified that being required to expose their genitals during strip frisk searches was in violation of their religious beliefs. Isma'il Abdur Rahim, a chaplain who advises Muslim inmates concerning their religious responsibilities, testified that he counsels Muslim inmates that strip searches violate the Muslim tenets and should be resisted.[2] Dr. Akbar Muhamad, Associate Professor of Islamic and African History and chairman of the Department of Afro-American and African Studies at the State University of New York at Binghamton, an expert on the tenets of the Muslim faith, testified that strip frisk searches were in violation of the Muslim faith which prohibited exposure of the genital area of the body to strangers.

Joseph G. Cannon, formerly Commissioner of Corrections of Maryland, Deputy Commissioner of Corrections of Minnesota and Superintendent, Illinois State Penitentiary, now Associate Professor at the University of Missouri, testified that routine strip frisk searches were irrational and that searches should take place only on probable cause. Kenneth Schoen, formerly Deputy Commissioner of Corrections of Minnesota and former consultant to the New York City Department of Correction, testified that routine strip frisk searches were irrational and offered alternative procedures deemed adequate for security. George Sullivan, Superintendent of Oregon State Correctional Facility, testified that routine strip searches were unacceptable and unnecessary, that such searches need only be made for cause. Dr. Frank L. Randle, M.D., formerly chief psychiatrist at Soledad Prison, California, testified that strip frisk searches caused psychological harm to the official performing them and the inmate subjected to them. Don Sloan, M.D., an obstetrician and gynecologist, testified that secreting matter in the rectal area caused discomfort, that objects placed beyond the sphincter muscle could not be seen on anal inspection and could be detected only if something protruded.

Charles E. Fenton, Jr., formerly warden of Lewisburg Federal Penitentiary and now correctional consultant, testified that routine strip frisk searches are necessary to prevent the introduction of contraband into the prison. Robert Martin, Northeast Regional Administrator, Federal Bureau of Prisons, supported strip frisk searches. Edward McSweeney, supervisor of Inmate Grievance Programs, testified that he had received 32 grievances about strip frisk

---

1. The bracketed numbers refer to pages of the trial transcript.

2. Although the name is the same, the chaplain is not the plaintiff-inmate in 78 Civ. 5382.

searches and that each grievance had been rejected.

Donald Newman, Dean, School of Criminal Justice, State University of New York at Albany, testified about the security problems created by uses of contraband. Raymond Procunier, former director of California Department of Correction, supported strip searches but would require strip frisk searches routinely of only the most dangerous inmates, roughly 10%. Others would be strip searched on probable cause.

Ann Elizabeth Mayer, Assistant Professor of Legal Studies, University of Pennsylvania School of Law and authority on Islamic law, testified concerning the obligation of modesty imposed and stated that one required against his will to transgress the Islamic tenets would not be in actual violation. Several correction officers, Joseph Brendise, Howard Cohen, Justo Fernandez and Roger Passino, testified about discovering contraband during strip frisk searches and about having altercations with Hurley.

State officials conceded that no alternative procedures had been studied or canvassed. State officials and all the experts testified that the contraband came into the prison largely by means other than by being hidden in the anal and genital areas of the inmates and that if the contraband were secreted past the sphincter muscle with no protrusion, it would not be detected by strip frisk in any event. Those favoring the practice supported it largely as a deterrent. It was agreed that the most likely source of contraband for inmates is through contact visits. Some defense witnesses testified that if strip frisk searches were abolished all inmates who left on work release would be under pressure from other inmates to bring contraband into the prison.

Dr. Ernest Porter, an ophthalmologist who specializes in treating glaucoma, testified that Rahim, in 78 Civ. 5382, suffered from a chronic simple glaucoma in one eye and a cataract and recessed angle in the other which could be the result of a recession angle glaucoma. Glaucoma requires frequent treatment, and unless a patient should be seen every six weeks, irreversible damage might occur. Rahim, while in custody, missed undergoing treatment for periods of seven, seven and a half, nine, ten and twenty months. It was necessary for Rahim to be treated outside prison since the prison lacked the necessary facilities. The treatment provided by defendants for Rahim was described by Dr. Porter as inadequate and dangerously sloppy.

*Findings of Fact*

The following constitute the court's factual findings. Many of the findings have been stipulated to even though they are part of the evidentiary proof. Some, although not agreed to by stipulation, are not in dispute, and thus only a few of the facts found can be categorized as contested.

I

The plaintiff class are inmates in the custody of the New York State Department of Correctional Services (hereafter "department"). They are persons who have been convicted of one or more felonies. With the exception of plaintiff Hurley, all members of the plaintiff class are subject to strip frisk searches conducted in accordance with department directives # 4910, # 4906 and # 4901.

A strip frisk, as defined in Directive # 4910, is a search of an inmate's clothes and body, including body cavities. For a male inmate this involves opening his mouth and moving his tongue up and down and from side to side, removing any dentures, running his hands through his hair, allowing his ears to be visually examined, lifting his arms to expose his armpits, spreading his fingers to expose the areas between his fingers, lifting his feet, lifting his testicles to expose the area behind the testicles and bending over approximately 90 degrees and spreading the cheeks of his buttocks to expose his anus to the frisking officer. For females the procedures are similar except females must squat to expose the vagina.

Strip frisks of inmates are performed routinely and without any requirement of cause to believe that the inmate has secret-

ed contraband in his anal or genital area on their leaving a visiting area in a maximum or medium security facility, going to or coming from a psychiatric observation unit, returning from work release programs, being transferred to or received from another facility or jurisdiction, going to or returning from court, hospital, outside medical care or consultation, funeral, sick leave (also known as deathbed visit); upon reception in a Special Housing Unit ("SHU"), before leaving and upon return to an SHU if he is to leave the facility or is returning from outside the facility; and during an overall search of a complete facility.

Inmates are placed in isolated psychiatric observation units because they exhibit behavior indicative of mental disorder or because of a medical problem which is deemed to require close observation. Inmates do not generally have prior notice that they are going to be removed from the general population or some other area of the facility and confined to the psychiatric observation unit. Before an inmate is placed in a cell in a psychiatric observation unit, the cell is thoroughly searched to assure that it contains no contraband. Although an inmate is usually examined by a member of the medical staff prior to placement in the psychiatric observation unit, digital intrusion searches are not routinely performed by the medical staff. Inmates in psychiatric observation units are seen daily by physicians.

An inmate is escorted by at least two correction officers to the psychiatric observation unit. During this escort the officers are instructed to walk behind or at the side of the inmate in order to prevent contact with other inmates, and contact with persons from outside the facility is, as a general rule, non-existent. The psychiatric observation unit contains a bed, securely fastened to the floor or wall, a toilet and a sink. An inmate is allowed no personal property while in the unit. Department personnel observe people in the unit approximately every half hour.

Commissioner Coughlin testified that strip frisk searches are ordinarily performed (277) on admission to a psychiatric observation unit and Commissioner Gard stated they were performed frequently (3293). The practice is that they are invariably performed (2196; 2333; 2339). On release, again the directives make strip frisk discretionary when inmates are released from the psychological unit, but Commissioner Coughlin stated that while the superintendents are allowed unfettered discretion (464), the intent is to have inmates strip frisked routinely before their return to the general population (283–84). The practice varies, however. Searches are routine at Ossining (2169) because of a belief that they are required (2196–97), but at Attica searches are never performed on exit because they are considered unnecessary (2335).

Transfers to other facilities take place on buses or in vans owned by the department. The buses hold a maximum of 40 inmates, and the vans hold a maximum of 10 inmates. At least two correction officers and a sergeant are assigned to each transporting bus or van.

The buses and vans are equipped with steel gates which separate the driver and correction personnel riding in the front from the inmates in the vehicle. The bus also has a compartment for a correction officer riding in the rear. A steel gate separates this compartment from the inmates riding in the vehicle. An intercom system allows the correction officers in the front of the vehicle and in the rear compartment to keep in constant communication. The department buses are equipped with specially placed and spaced mirrors to facilitate observation of the inmates during the trip.

Before inmates board the van or bus, they are placed in leg irons and handcuffs. The inmate is allowed to carry on his person matches, cigarettes, and a handkerchief. When an inmate is informed that he is going to be transferred, he is immediately confined to his cell. This happens on the day of the transfer or the night before the transfer. Inmates transferred from one department facility to another are not routinely subjected to a metal detector search before or after the transfer.

The certificate of search is completed for all inmates when they are strip frisked upon leaving a facility, and the certificate travels with the transfer officers to the receiving facility. Approximately 25,000 inmates were transferred during calendar year 1979. Upon arrival at the new institution, the inmate is strip frisked even though he was subjected to a strip frisk on leaving the former institution and was under correction officer escort throughout the trip.

Inmates are transported for medical purposes to hospitals and doctors' or dentists' offices. The department's policy is, whenever feasible, not to inform inmates of these trips ahead of time. The inmate is strip frisked before leaving for the medical visit.

If when an inmate visits a doctor, hospital or other medical facility, the restraints that have been put on him before leaving the prison—leg irons and handcuffs—are removed at the request of the medical personnel, the inmate is supposed to be kept under the constant observation of the correction officer accompanying him unless circumstances related to the delivery of medical services make observation impractical. On return to prison, the inmate is strip frisked.

An inmate is strip frisked on being taken to an SHU. .An SHU within the meaning of Directive # 4910 is a cell or group of cells within a facility used for protective admission, detention admission or adjustment admission. Before an inmate is placed in a cell in an SHU, that cell is thoroughly searched. An inmate is escorted to SHU by at least two correction officers. Generally, the inmate is handcuffed at this time and, if coming from another facility, he may have on leg irons as well. During this escort the officers are instructed to walk behind or at the side of the inmate in order to prevent contact with other inmates and, as a general rule, contact with persons from outside the facility is non-existent.

An inmate is allowed some of his personal property while in an SHU, but before turning over the property to the inmate, it is thoroughly searched by prison authorities.

When a person leaves an SHU in order to leave the facility for any reason, he is strip frisked. Upon return to the SHU from outside the facility, an inmate is strip frisked. Inmates in an SHU who receive visits are escorted to the visiting room by correction officers. In some cases the inmate is turned over to the visiting room officer. In other cases the escorting officer remains present to observe the visit. In both cases the inmate is strip frisked after leaving the visiting room. Inmates are strip frisked after a visit during which they are handcuffed and with an officer present throughout observing the visit.

Strip frisk searches after visits, prior to transfer and prior to transport on an outside visit are both discretionary and mandatory in the regulations. Deputy Commissioner Gard explained that the inconsistency was to allow for administrative flexibility in unusual circumstances.

The discretion which the regulations permit has not been explained or made clear in any written or specified guidelines disseminated by the central office. There was conflicting testimony about the actual practice. Each superintendent of a facility apparently is free to make his own policy concerning how this discretion is to be exercised. Wilson Walters, the Superintendent of the Ossining facility, a maximum security facility, apparently was unaware that he had any discretion in the matter and felt that strip frisks had to be performed routinely because they were required. Yet, there was testimony that strip frisks at Ossining were sometimes not undertaken in the discretion of the officer on the scene.

The testimony of the officials of the corrections department was that strip frisks occurred after each contact visit. Inmates, however, testified that discretion is in fact exercised. The Commissioner testified that strip frisk searches prior to departure for another institution was permissible but not mandatory. Subsequently, he and Commissioner Gard testified that they were mandatory. Superintendent Walters also believes they are required. While the central office's view is that strip frisks are discretion-

ary when a transferred prisoner is received at a new institution, the Superintendent at Ossining is under the impression that they are required. While strip frisk searches seem mandatory when an inmate goes on a visit outside the facility and may be required on return according to the directives and the understanding of central office personnel, Superintendent Walters believes such searches are mandated and must be routinely performed. The inmates testified to varying experiences, and Correction Officer Alphonse Trulli, a correction officer for 11 years, reads the directives as not requiring him to subject inmates returning from outside visits routinely to strip frisk searches, but to exercise discretion.

The central office does not believe strip frisks are necessary on release from a special housing unit, but they are routinely performed at Ossining according to its superintendent, and it is stipulated that this is the practice at Great Meadow.

Inmates are also strip frisked when a facility-wide area search is performed. The Superintendent at Ossining testified both that in such cases strip frisk searches are performed and that they are not performed (compare 2240 with 2242).

Inmates who refuse to submit to a strip frisk are forcibly compelled to comply, and such refusal violates prison rules and subjects the inmate-refuser to penalties such as time in segregation. Prison authorities provide for no exception to the strip search requirement for any inmate, regardless of religious belief.

More than one correction officer may be present at a strip search. Strip frisks performed after a number of inmates have simultaneously had contact with persons from outside the facility are sometimes performed on a group of inmates together in one location at one time.

The amount of contraband found through the anal and genital searches authorized by directive # 4910 constitutes a minute percentage of the total amount of contraband confiscated annually by employees of the department.

## II

Religious advisors from the Ya Sin Masjid of Brooklyn, New York are employed by the defendants to give spiritual guidance to Muslim inmates. There is an inmate Imam, or minister, in each facility who gives spiritual guidance to the inmate followers of Islam.

The Muslim subclass is comprised of Muslim inmates incarcerated in the New York State prison system. The behavior of Muslims is regulated by Islamic law, which is set out in the Qur'an and Hadith. To the Muslim, the Qur'an is the highest source of all laws. It is the literal word of God. The Hadith are the sayings and actions of the Prophet of Islam, Muhammad, as set down by his followers.

One becomes a Muslim by taking the "Shahada," or Profession of Faith, which is a simple declaration of faith. The Muslim must intend to follow the precepts and obligations of Islam, and his declaration must be sincere.

An important precept of Islamic law is the tenet of modesty, and the Islamic requirement of modesty applies equally to all members of the subclass. For the adherent to Islam, life itself is of higher value than modesty, and a Muslim need not protect his modesty to the point of sacrificing his life. For Believers it is sinful to commit suicide.

## III

At Auburn Correctional Facility on October 1, 1976, plaintiff Hurley refused to submit to a rectal search when being admitted to an SHU. A Superintendent's proceeding was conducted on October 14, 1976, and Hurley appealed to the Commissioner. A written record of the proceeding was made. It was reviewed by Joseph Keenan, Director of the SHU as a member of the Departmental Review Board, and he affirmed the disposition of the proceeding on October 24, 1976.

On January 24, 1977, Keenan was advised by officials at Auburn that on January 10, 1977, Hurley had been found guilty in a

Superintendent's proceeding of refusing to comply with strip frisking procedures when he returned from a trip to a dentist. On March 21, 1977, the Superintendent of Auburn Correctional facility requested Keenan to transfer Hurley from Auburn to another facility. Hurley was transferred.

On April 15, 1977, plaintiff Hurley was transferred by bus from Auburn Correctional Facility to Green Haven Correctional Facility on route to Great Meadow Correctional Facility. Hurley was housed at Green Haven from the night of April 15 until the morning of April 18, 1977, when he was put on a Department of Correctional Services transfer bus bound for Great Meadow. While at Green Haven Hurley complained that he was ill. On the morning of April 18, 1977, Hurley was carried on to the transfer bus, and was carried off the transfer bus on arrival at Great Meadow Correctional Facility. He was then taken to the psychiatric observation unit where he was strip frisked. The next day, April 19, 1977, Hurley was examined by Dr. Edison.

On the morning of April 24, 1977, plaintiff Hurley was escorted to the SHU to await a Superintendent's proceeding. Pursuant to Department Directive # 4910, a strip frisk was performed on plaintiff Hurley on April 24, 1977, upon his entering the SHU.

Before Hurley was placed in his cell, a physical altercation occurred between him and various correction personnel. A Use of Force Report and an Unusual Incident Report were prepared in response to the April 24 incident and were received at the central office of the Department by April 25. A copy of those reports was placed in Hurley's central office file.

The April 24 altercation resulted in a Superintendent's proceeding on May 4, 1977, which found Hurley guilty. Keenan received the record of the proceedings on May 11, 1977, and on review the disposition was affirmed on May 24, 1977.

Hurley was transported to Auburn Correctional Facility on Tuesday, May 17, 1977, for a court appearance. Before leaving Great Meadow at approximately 1:15 P.M.

he was strip frisked. Force was used to complete the strip search. A Use of Force Report was prepared and sent to the Commissioner.

Hurley was received at Auburn Correctional Facility on Tuesday, May 17 at approximately 6:30 P.M. Upon his arrival at the SHU at Auburn, plaintiff was strip frisked. Force was used to complete the strip search, and a Use of Force Report was prepared and sent to the Commissioner.

Hurley was transported to court in the City of Auburn from the Correctional Facility at approximately 9:35 A.M. on the morning of Wednesday, May 18. Before leaving the prison, plaintiff was strip searched. Force was used to complete the strip frisk search. A Use of Force Report was prepared and sent to the Commissioner, and an Unusual Incident Report was filed.

After his court appearance, Hurley was transported from Auburn back to Great Meadow Correctional Facility on May 18, 1977. When plaintiff was returned to the SHU at Great Meadow at approximately 4:15 P.M. he was strip frisked. Force was used to complete the strip frisk. A Use of Force Report was prepared and sent to the Commissioner.

On May 19, 1977, when plaintiff Hurley was returning to his cell from outdoor exercise in the north ward at the SHU at Great Meadow, a physical altercation occurred between plaintiff and various correction personnel. A Use of Force Report was prepared and sent to the Commissioner. An Unusual Incident Report was filed.

When an inmate is transferred from one correctional facility to another, the amount of property he is allowed to transfer and the manner in which excess property is supposed to be disposed of is governed by Department Directive # 4913 dated March 16, 1976, plaintiff's Exhibit 35. Inmate property in excess of that which can be contained in four state duffel bags is shipped to another facility at an inmate's own expense by means of fourth class United States Mail. The fourth class rates are set forth on plaintiff's Exhibit 36.

## IV

Isma'il Abdur Rahim is a prisoner in custody of the New York State Department of Correctional Services originally sentenced to a term of 20 to 30 years for the crime of robbery in the first degree imposed on May 11, 1967. His minimum sentence subsequently was reduced to 8⅓ years. Plaintiff currently is incarcerated at Ossining Correctional Facility.

Exhibit 50 is a series of four photographs taken by Robert Zeglovitch, a legal assistant with Prisoners' Legal Services of New York, of plaintiff Isma'il Abdur Rahim at Attica Correctional Facility on September 26, 1980. The photographs accurately depict Mr. Rahim's appearance on that date.

There currently is no ophthalmologist attending inmate-patients at Ossining Correctional Facility. The slit lamp and applanation tonometer at Ossining Correctional Facility were not deemed usable by the ophthalmologist who last attended inmate-patients at that facility.

*Determination*

The issues for determination are: (1) whether strip frisk searches constitute a general infringement of the constitutional rights of the plaintiff class and/or may be specially offensive to the religious tenets of the Muslim subclass, (2) whether Hurley's claim of excessive use of force and for damages therefor has been sustained, and finally (3) whether defendants are obligated to forgo subjecting Rahim to strip frisk searches as a requisite for him to receive adequate medical attention for glaucoma which can only be obtained outside the prison.

■ At the threshold, it must be recognized that prisons differ from a free society in that they house people against their will for infractions of the criminal laws enacted to insure order and safety in society at large. *See Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974). While prisoners do not forfeit all the constitutional rights they would enjoy as free men, the fact of their confinement and the legitimate penological objectives and policies of the correctional institutions in which they are held require a withdrawal or limitation of many privileges and rights. *See Bell v. Wolfish,* 441 U.S. 520, 545–46, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125, 97 S.Ct. 2532, 2537–38, 53 L.Ed.2d 629 (1977); *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Restrictions on individual rights are enforced which would not be tolerated in a free society, *see Maguire v. Wilkinson,* 405 F.Supp. 637, 639 (D.Conn.1975), but a mutual accommodation between institutional needs and objectives and the guarantees of the constitution must be effectuated. *See Bell v. Wolfish, supra,* 441 U.S. at 546, 99 S.Ct. at 1877–78, *quoting from Wolff v. McDonnell, supra,* 418 U.S. at 556, 94 S.Ct. at 2974.

■ In attempting to effect that mutual accommodation courts must heed the admonition that they are ill equipped to deal with the increasingly urgent problems of prison administration. *Jones v. North Carolina Prisoners' Labor Union, Inc., supra,* 433 U.S. at 128, 97 S.Ct. at 2539. Where considerations of institutional security, which are peculiarly within the province and professional expertise of correctional officials, are implicated, courts are required to defer to the expert judgment of these officials. *See id.* at 132–33 & n. 9, 97 S.Ct. at 2541 & n. 9; *Pell v. Procunier, supra,* 417 U.S. at 827, 94 S.Ct. at 2806; *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). Moreover, deference is deemed appropriate because it is the responsibility of the legislative and executive branches of government, both state and federal, not the judiciary, to operate and control correctional facilities. *See Bell v. Wolfish, supra,* 441 U.S. at 547–548, 99 S.Ct. at 1878–79. Indeed, the informed discretion of prison officials that there is a potential danger may be a sufficient and justifiable basis for limiting rights, even though this showing might be "unimpressive if ... submitted as justification for governmental restriction of the personal

184

[liberties of] members of the general public." *Pell v. Procunier, supra,* 417 U.S. at 825, 94 S.Ct. at 2805.

■ Prison officials are not required to justify the reasonableness of the regulation by showing that it is the least restrictive means to achieve their objectives. In the absence of evidence showing that the officials have exaggerated their response to security matters, their expert judgment should be accepted by the courts. *See Jones v. North Carolina Prisoners' Labor Union, Inc., supra,* 433 U.S. at 128, 97 S.Ct. at 2539, *quoting Pell v. Procunier, supra,* 417 U.S. at 827, 94 S.Ct. at 2806; *Aziz v. LeFevre,* 642 F.2d 1109, 1112 (2d Cir. 1981) (Meskill, J., concurring).

■ While courts in this circuit have been especially solicitous of the religious rights of prisoners, *see e.g. Kahane v. Carlson,* 527 F.2d 492 (2d Cir. 1975); *Leon v. Harris,* 489 F.Supp. 221 (S.D.N.Y.1980) (MacMahon, J.); *Moskowitz v. Wilkinson,* 432 F.Supp. 947 (D.Conn.1977); *Monroe v. Bombard,* 422 F.Supp. 211 (S.D.N.Y.1976) (Carter, J.), restrictions designed to achieve legitimate penological objectives, even in this area, pass constitutional muster if reasonably adapted to achieving important state goals. *See Mawhinney v. Henderson,* 542 F.2d 1, 3 (2d Cir. 1976); *LaReau v. MacDougall,* 473 F.2d 974, 979 (2d Cir. 1972), *cert. denied,* 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973).

■ In a prior opinion in this case, routine strip frisk searches were held to violate the inmate's rights. *See Hurley v. Ward,* 448 F.Supp. at 1230. ("The whole challenged procedure appalls. Inmates are required to open their mouths, wag their tongues, turn and show the bottoms of their feet and spread their toes—a procedure akin to displaying slaves for auction, cattle for market, and animals for sale. The ultimate degradation is the required lifting of the testicles and the bending over to spread the buttocks."). Since that decision, *Bell v. Wolfish, supra,* has been decided by the Supreme Court. The Court held that strip frisk searches could be conducted on less

than probable cause but were at all times subject to the test of reasonableness. *Id.* 441 U.S. at 560, 99 S.Ct. at 1885. To put it more precisely, strip frisk procedures may be outlawed if the complaining inmate meets the burden of establishing the unreasonableness of the search. *Jones v. North Carolina Prisoners' Labor Union, Inc., supra,* 433 U.S. at 128, 97 S.Ct. at 2539. Accordingly, we now proceed to examine the state practice within the landscape defined by the pertinent case law to determine the reasonableness of the practice as determined by the evidence adduced in this record.

The purpose of strip frisk search policy is to prevent and deter the introduction of contraband into the prison, but there was general agreement among the defendants' and plaintiffs' experts confirmed by evidence (Superintendent Walters, after ten years in the state system, could count only ten incidents when he had heard that contraband had been found in the genital or anal area on routine strip frisk search) that routine strip frisk searches do not turn up very much contraband. We are concerned here with money and narcotics, but strip frisk searches have turned up minimal amounts of contraband even if that term is broadly defined to embrace all physical goods or materials which inmates may not possess while in prison.

The security experts at trial, except for Roger Martin, Northeast Regional Administrator, Federal Prisons, who did not know whether contraband secreted in the rectum could be detected, agreed that contraband hidden in the rectum cannot be seen on visual inspection, unless part of it protrudes out from the external sphincter muscle. Dr. Don Sloan, an obstetrician and gynecologist, testified that any object placed in the rectum past both sphincter muscles cannot be seen on visual inspection. He testified that there may be discomfort and some difficulty in walking under such conditions but it can be done and the secreted object will not be detected. Although there are admittedly several hundred thousand strip frisks per year (plaintiffs' estimate is 500,-000 annually), since the start of the unusual

incident report in 1976, only some 49 actual discoveries of contraband in the anal or genital area, including underwear, (which could have been discovered by simple strip and search of clothing) had been made by time of trial. These reports are usually made when dangerous contraband is discovered (3273, 3277), and such reports are made in all instances when drugs, money or weapons are found on an inmate as a result of strip frisk (2209). Some of the witnesses recounted the same story about a key to handcuffs being concealed in the rectum, but the tale appears to be an often repeated legend recounted over the years by prison officials when called upon to articulate some justification or rationale for this demeaning and degrading practice on prisoners in their custody.

Of 27 incidents of finding contraband in the anal cavity during strip frisk, three were conducted on probable cause (B 104, B 105, B 106, B 107, B 111, B 113, B 114, B 116).[3] Of the 49 actual discoveries of contraband, all but eight occurred when strip frisk was conducted after a contact visit. The eight are described in B 15, B 54, B 102, B 113, B 114, B 115, and B 116. No SHU strip frisk search except that reported in B 54 turned up any contraband, no strip frisk before or after psychological observation unit, transfer or area search, and no search after outside visit led to any discovery, and only the temporary release search reported in B 115 resulted in finding contraband. While defendants' experts continue to justify routine strip frisks as deterrents, plaintiffs' experts were of the opinion that it did not deter inmates from seeking to bring contraband into prison in their bodies. They concluded that it made inmates do a better job. It is also conceded that despite the strip frisks, large amounts of drugs and money continued to be smuggled into the prisons. Apparently a current prevalent practice is bringing it in in balloons which are either swallowed and later retrieved from the stool or secreted it in the anal cavity past the inner sphincter muscle. An enormous number of balloons are found in facility sewage (442).

**3.** References are to exhibits.

There are many operative restraints which make it unlikely that most inmates would use their anus as a receptacle for contraband. There is pain and discomfort and difficulty in walking resulting from inserting something into the anus past the sphincter muscle (914–15, 930). There are psychological restraints (922–23), and the practice is ultimately abhorrent. The balloons, however, show that some inmates do defy these restraints and taboos.

There are jurisdictions in which strip frisk searches are only conducted on probable cause. Most notably this is the practice in Oregon. They were mandated in California during Procunier's tenure only on probable cause, and were discretionary in other situations. Superintendent Sullivan testified that he had audited San Quentin, Soledad and Folsom in California and strip frisk searches are not routinely administered. The same he found true in the California Women's Prison at Frontera, the United States Penitentiary at Lampoc, the Connecticut State Prison at Somers, and the Illinois State prisons at Maynard and Vienna.

Robert Martin, recreational administrator for the Northern Region of the United States Bureau of Prisons, testified that as much as 25% of the contraband came through employees; Procunier put the figure at 31%; and Fenton believed only 1 or 2 employees were so involved. Donald Newman, Dean of Criminal Justice, State University at Albany, stated that the state investigation commission had found that in some of the state's institutions introducing contraband into a prison was prevalent among correction officers.

Sullivan, as examiner for the Commission on Accreditation for Corrections, audits prisons to determine whether they are in compliance with the American Correctional Association's accreditation guidelines and thus can be accredited (1231–32). These guidelines require a reasonable belief that a person is carrying contraband before a visual inspection of his body cavity takes place. Correction officers justify strip frisk

searches on security grounds, but evidence in this case demonstrates that these practices increased tension and hostility between inmates and correction officers. Dr. Rundle testified that the effect of these routine practices was a worsening of the inmate/guard relationship (1707). Superintendent Spellman viewed them as creating the risk of physical encounter between staff and inmate (1266). Professor Joseph Cannon, Associate Professor, Department of Justice, University of Missouri, said it built up hostilities which in time might trigger a serious encounter (522). Inmates testified about the hostility it causes them to feel and the derogatory remarks the guards sometimes make. The Commissioner conceded that the procedure causes inmate hostility.

The policy and practice appear to further no penological objective. Little contraband is discovered through these routine searches. The practice increases tension and hostility in the prisons which would seem to disserve security objectives. Both correction officers and inmates find the practice distasteful.

Although it was conceded that most of the contraband comes onto the premises through corrupted prison employees and, according to reports of investigation in this state, even through correction officers themselves, penological and security rationale was defendants' justification for the routine strip frisk procedures. There was no rational flooring for the routine practice. Apparently, strip frisk searches are performed routinely, not because they are really necessary or even helpful in controlling contraband, but simply because that is how things have always been done.

Moreover, defendants' policy is apparently not clear. Central office reads the directive differently from the way some of those required to put the policy into effect do. No guidance exists to spell out when the directive means for routine strip frisk searches to be mandatory and when they are discretionary.

On this record plaintiffs have established the unreasonableness of strip frisk searches, except those after contact visits. It is chiefly in the case of strip frisk searches after a contact visit that contraband has been uncovered. When an inmate leaves an institution on an outside visit or transfer to another institution, there may well be a reasonable basis for a strip search, that is search of clothing and removal of clothes and visual examination of the naked body to be certain no weapons are being concealed in order to protect the transporting correction officers against possible injury from hidden weapons. No rational basis, however, exists for strip frisk searches on those occasions. Moreover, on such trips a prisoner is handcuffed and chained by leg irons and shackles, so no rational penological or security factor warrants a strip frisk on his return from an outside visit or arrival after transfer to his new institution. The same reasoning would render unreasonable a strip frisk search on entering or leaving an SHU.

■ The court holds, therefore, that routine strip frisk searches may be required under *Bell v. Wolfish* after contact visits but they are clearly unreasonable and unjustified under all other circumstances. The recurrent strip frisk searches which inmates have been subjected to are clearly a denial of their right to due process.

■ The religious tenets of the Muslims in the prison setting must give way to penological and security requirements of the prisons. Strip frisks after contact visits may be required of them as of any other inmate. Moreover, the finding of unreasonableness under *Bell v. Wolfish* is limited only to routine strip frisk searches. It is not unreasonable to require inmates to remove their clothes, including underwear, to permit a visual inspection of the naked body. That may be warranted and justified as a routine under a variety of circumstances and strip frisk searches may be performed on probable cause. The court simply holds that routine strip frisk searches meet the test of reasonableness only after contact visits.

■ Hurley has been an activist prisoner who has repeatedly and regularly demanded that he be accorded what he deems to be his rights. As Judge Gurfein said:

"Such activism tends to elicit a reactive use of power. To persons in authority in the prison scene that power is readily available." *Mukmuk v. Commissioner of Dep't of Correctional Services*, 529 F.2d 272, 274 (2d Cir.), *cert. denied*, 426 U.S. 911, 99 S.Ct. 2238, 48 L.Ed.2d 838 (1976). The basic question is whether the line of permissible reaction has been overstepped. Most of the altercations described erupted because of Hurley's refusal to submit to strip frisk searches. Hurley's testimony concerning the extent and gravity of his beating cannot be fully credited, but the testimony of the correction officers that in these situations they handled him gently is even less believable. On several occasions the beatings were witnessed. I find that on at least one occasion excessive use of force was used, but the evidence is insufficient to warrant an award of damages.

Rahim's claim of need of outside treatment for his glaucoma is supported. Since strip frisk searches as a prelude to an outside visit to a hospital are unreasonable, that impediment can no longer be imposed as a condition for his receiving treatment. Defendants are required to provide him with the proper medical attention for the treatment of his illness.

SETTLE ORDER.