Richie SHOW, Robert Johnson, John Harris and Saladeen Malik, Plaintiffs,

v.

Francis PATTERSON, Warden; Captain Whitehead; Captain Simon; and Captain Hurrey # 449, Defendants.

Robert JOHNSON # 361–91–00390; Richie Show # 141–92–01593; John Harris # 349–92–01238; Saladeen Malik # 441–91–12496, Plaintiffs,

v.

Francis PATTERSON, Warden–George R. Vierno Center; Captain Whitehead; Captain Simon; Captain Hurrey Shield # 449, Defendants.

Nos. 92 Civ. 7089 (SWK), 92 Civ. 7310 (SWK).

United States District Court, S.D. New York.

Jan. 7, 1997.

Richard Shaw, Wallkill, New York, Pro Se.

Robert Johnson, Brooklyn, New York, Pro Se.

John Harris, Attica, New York, Pro Se.

Saladeen Malik (a/k/a Ernst McEachern), Attica, New York, Pro Se.

Paul A. Crotty, Corporation Counsel of the City of New York, New York City by Deanna R. Waldron, for Defendants.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

In this prisoners' civil rights action, defendants Francis M. Patterson ("Warden Patterson"), Captain Raymond Whitehead ("Captain Whitehead"), Captain Ronny Simon ("Captain Simon"), and Captain Ronald Hurrey ("Captain Hurrey") move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the ground that no genuine issues of material fact exist. For the reasons set forth below, defendants' motion is granted in part and denied in part.

### BACKGROUND

On or about June 15, 1992, at approximately 5:00 p.m., plaintiffs Richard Shaw ("Shaw"),[1] Robert Johnson ("Johnson"), John Harris ("Harris") and Saladeen Malik ("Malik") were present in the mess hall at the Department of Correction's George R. Vierno Center on Rikers Island. At this time, a prison disturbance began as a result of a verbal confrontation between Captain Whitehead and an inmate not a party to the present litigation. Captain Whitehead had directed the disruptive inmate to leave the mess hall and then to place his hands on the wall for a frisk. Use of Force Report by Captain Whitehead, dated June 15, 1992, annexed to the Declaration of Deanna Waldron, sworn to Jan. 16, 1996 (the "Waldron Decl."), as Exh. "4," at ¶¶ 4–6. According to Captain Whitehead, when he attempted to handcuff the inmate, the inmate unexpectedly turned around, grabbed him by the waist, lifted him into the air and threw him onto the floor. *Id.* Captain Whitehead claims that the in-

---

1. In both complaints, plaintiff Richard Shaw is incorrectly identified as "Richie Show."

mate then began punching him in the head and verbally threatened to kill him. *Id.* Other officers quickly came to Captain Whitehead's assistance and successfully subdued and handcuffed the inmate. *Id.* The disturbance escalated when a second inmate assaulted another officer, and a large group of inmates rushed toward the mess hall doors. Use of Force Report by Officer Mooney, dated June 16, 1992, annexed to the Waldron Decl. as Exh. "4," at ¶ 4; Deposition of Richard Shaw, taken Nov. 8, 1994 (the "Shaw Dep."), annexed to the Waldron Decl. as Exh. "Dep.," at 15–16. Once the inmates forced open the mess hall doors, a violent altercation ensued between several inmates and officers. *Id.*

At this time, plaintiffs and other inmates from their housing area were ordered to exit the mess hall and were detained in the corridor while members of the "Probe Team" (or riot squad) responded to the disturbance. Subsequently, plaintiffs and approximately forty other inmates were taken to an intake area where Captain Hurrey, one of approximately fifteen officers present, ordered them to remove their clothes. Shaw Dep. at 38. Plaintiffs claim that they asked Captain Hurrey to take them to a separate area, as officials had done on other occasions, in light of their Muslim principles.[2] Deposition of John Harris, taken Dec. 5, 1994 (the "Harris Dep."), annexed to the Waldron Decl. as Exh. "Dep.," at 72. According to plaintiffs, Captain Hurrey ignored this request. *See* Complaint in 92 Civ. 7089, at 3. In addition, plaintiffs claim that the riot squad, equipped with riot gear, was standing nearby and that Captain Hurrey and other prison officials made threatening comments about the consequences of non-compliance. *Id.* For example, Johnson claims that one captain stated that if the inmates did not comply with their orders, the officers "would try their best to kill [the inmates]." Deposition of Robert Johnson, taken Dec. 6, 1994 (the "Johnson Dep."), annexed to the Waldron Decl. as Exh. "Dep.," at 47.

According to Shaw, the inmates were forced to stand naked in the cell for approximately one half hour. Shaw Dep. at 42. Moreover, plaintiffs claim that none of the officers used the word "search" and that no visual inspection or cavity search was ever conducted. *Id.*; Johnson Dep. at 47. Rather, plaintiffs claim that they were simply ordered to strip and go into a small cell and stand "heel to heel." *Id.* at 41–42.[3] As a result of the size of the cell and the number of inmates involved in the search, plaintiffs assert that the inmates' " 'private parts' were touching one another." Complaint in 92 Civ. 7089, at 3. Plaintiffs claim that the only "search" the officers conducted consisted of shuffling the inmates' clothes, which were in a pile in the center of the cell. Harris Dep. at 70–71; Johnson Dep. at 49. Moreover, according to Johnson, the officers were not actually searching for contraband when they were kicking the inmates' clothes around on the floor. *Id.* In addition, Johnson claims that while the prisoners were taking off their clothes, the guards were standing on the other side of the gate, laughing and calling the prisoners names. Johnson Dep. at 48. According to plaintiffs, the purpose of the "search" was to humiliate the inmates, rather than to inspect them for contraband, as evidenced by the fact that unlike in other strip searches, the inmates were not asked to lift their feet, open their mouths or squat down. Harris Dep. at 72; Johnson Dep. at 47; Malik Dep. at 51.

According to Johnson, when he and the other inmates from his housing unit were ordered to leave the mess hall, the riot squad ordered them to put their faces against the wall. Johnson Dep. at 18, 23. At this time, Johnson claims that the riot squad, dressed in riot gear and armed with "blackjack" sticks, began to use force against the inmates. *Id.* at 24. Specifically, Johnson

---

**2.** Plaintiffs contend that group strip searches conflict with their religious tenets because the Muslim faith prohibits exposure of the genital area of the body to strangers.

**3.** However, Johnson and Malik stated that after the inmates were ordered to strip, they were told to put their hands on or above their heads against the wall. Johnson Dep. at 49; Deposition of Saladeen Malik, taken Nov. 29, 1994 (the "Malik Dep."), annexed to the Waldron Decl. as Exh. "Dep.," at 47.

claims that he was thrown against the wall by Captain Simon, *see* Complaint in 92 Civ. 7310, at 3, and then hit four or five times in the back and shoulder with a blackjack by an unknown member of the riot squad, *id.;* Johnson Dep. at 24. Similarly, Malik recalled seeing Captain Simon push Johnson in the "pit of his back" with his hands. Malik Dep. at 38. Malik further stated that Captain Simon did not have a stick, and that Captain Simon pushed Johnson after Johnson had started to turn around from the wall to ask whether "all this [was] necessary." *Id.* at 39.

As a result of this physical force, Johnson claims that he sustained shoulder and lower back injury, though he was not given medical attention until three days after the incident. *Id.* at 4.[4] The doctor who performed the examination noted that Johnson complained of pain to his shoulder, back and chest. Investigative Supervisor's Report, dated June 26, 1992, annexed to the Waldron Decl. as Exh. "5." Although the doctor noted that there was no evidence of swelling or bruises, he marked that Johnson exhibited "[t]enderness in palpation of left scapulse [sic]." *Id.* Johnson was treated with an analgesic balm and Ibuprofen. *Id.*

On or about September 30, 1992, plaintiffs commenced the present action pursuant to 42 U.S.C. § 1983, alleging that the strip search violated their First Amendment right to practice their Muslim religious beliefs, their Fourth Amendment right to privacy, and their Eighth Amendment right to be free from cruel and unusual punishment. In addition, plaintiffs assert a free exercise claim pursuant to the Religious Freedom Restoration Act. On or about October 8, 1992, plaintiffs commenced a second action, entitled *Johnson, et al. v. Patterson,* 92 Civ. 7310 (KTD), in which they alleged virtually identical claims against the same defendants, as well as a claim that Captain Simon used excessive force against Johnson. By Order of this Court dated August 3, 1994, the two actions were consolidated, pursuant to Federal Rule of Civil Procedure 42(b).

4. According to Johnson, he was not given an opportunity to report the incident or seek medical care before that time. Defendants assert,

# DISCUSSION

## I. Standard of Law

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must initially satisfy a burden of demonstrating the absence of a genuine issue of material fact, which can be done merely by pointing to an absence of evidence in support of the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986). The nonmoving party must then come forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial," *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552.

The Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Constr. Corp. v. New York,* 762 F.2d 243, 249 (2d Cir.1985); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Hathaway v. Coughlin,* 841 F.2d 48, 50 (2d Cir.1988); *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). But the Court is to inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for the party," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), and to grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative, *id.* at 249–50, 106 S.Ct. at 2510–11; *Knight v. United States*

however, that Johnson simply failed to report the incident until three days after it occurred.

*Fire Ins. Co.,* 804 F.2d at 12, 15; *Argus Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). To determine whether the nonmoving party has met his or her burden, the Court must focus on both the materiality and the genuineness of the factual issues raised by the nonmovant. As to materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510. A dispute over irrelevant or unnecessary facts will not preclude summary judgment, *id.,* but the presence of unresolved factual issues that are material to the outcome of the litigation mandates a denial of the summary judgment motion, *see, e.g., Knight v. United States Fire Ins. Co.,* 804 F.2d at 11–12. In sum, if the Court determines that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)).

## II. Lack of Personal Involvement

Section 1983 imposes liability on any person who, acting pursuant to state government authority or under color of state law, abridges "rights, privileges, or immunities secured by the Constitution and laws...." 42 U.S.C. § 1983. However, a defendant may be liable under Section 1983 only if he was personally involved in the alleged constitutional violation. *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). Respondeat superior is not a valid basis for Section 1983 liability and cannot be used as a substitute for personal involvement. *Monell v. Department of Soc. Servs. of New York,* 436 U.S. 658, 691–93, 98 S.Ct. 2018, 2036–37, 56 L.Ed.2d 611 (1978). There are four ways in which a defendant may be personally involved in a Section 1983 violation: (1) by participating directly in the deprivation; (2)

by failing to remedy the wrong after learning of the violation through a report or appeal; (3) by creating a policy or custom under which the unconstitutional practices occurred; or (4) in managing the subordinates who caused the deprivation in a grossly negligent way. *Williams v. Smith,* 781 F.2d at 323.

Plaintiffs do not allege that Warden Patterson or Captain Whitehead were involved in the strip search or that they used force against Johnson. *See* Malik Dep. at 65–66.[5] In addition, none of the Department of Corrections records prepared as a result of the prison disturbance indicate any personal involvement by either of these defendants in the acts alleged in plaintiffs' complaints. Similarly, plaintiffs do not allege any facts indicating that Warden Patterson or Captain Whitehead created or were aware of a prison policy of violating prisoners' rights by conducting improper strip searches or by using excessive force. Finally, the complaints are devoid of any allegations or implications that Warden Patterson or Captain Whitehead supervised subordinates in a grossly negligent manner. Since plaintiffs' complaints lack any allegations against either of these defendants for the conduct on which plaintiffs' claims are based, all claims against Warden Patterson and Captain Whitehead pursuant to Section 1983 are dismissed.

## III. Free Exercise of Religion

Until recently, the standard for assessing whether the conduct of prison officials impermissibly infringed upon an inmate's free exercise of religion was "one of reasonableness," depending on whether the allegedly unconstitutional prison regulation or action was "reasonably related to legitimate penological interests." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 353, 107 S.Ct. 2400, 2407, 96 L.Ed.2d 282 (1987) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64 (1987)). In November 1993, however, Congress enacted the Reli-

---

5. In fact, aside from the caption, Warden Patterson's name is not mentioned in either complaint. Without substantive allegations against these defendants, plaintiffs' claims against them must be

dismissed as a matter of law. *See Rodriguez v. Chandler,* 641 F.Supp. 1292, 1294 n. 1 (S.D.N.Y. 1986), *aff'd,* 841 F.2d 1117 (2d Cir.1988).

gious Freedom Restoration Act ("RFRA"), which established a compelling interest standard for evaluating the constitutionality of governmental policies that infringe upon the constitutional freedom of religion. 42 U.S.C. § 2000bb(a)(5). Previously, district courts in this circuit were in disagreement as to whether this standard applied to all free exercise claims, including those asserted under the First Amendment, or only those specifically brought pursuant to RFRA. *Compare Boomer v. Irvin,* 919 F.Supp. 122, 125 (W.D.N.Y.1995) (applying RFRA's compelling interest standard to free exercise claim despite fact that plaintiff did not bring claims pursuant to RFRA), *with Francis v. Keane,* 888 F.Supp. 568 (S.D.N.Y.1995) (applying different standard to free exercise claims depending on whether they were brought pursuant to RFRA or the First Amendment).

■ It is now clear, however, that the Court should conduct separate analyses of free exercise claims depending on whether such claims were brought pursuant to RFRA or the First Amendment. *Jolly v. Coughlin,* 76 F.3d 468, 475 (2d Cir.1996). In *Jolly,* the Court held that "the *O'Lone* 'reasonableness' test continues to have vitality for claims brought directly under the First Amendment—for the simple reason that a congressional enactment cannot modify the Supreme Court's constitutional interpretation—free exercise claims brought by prison inmates under RFRA are subject to the compelling interest test." *Id.* In any event, the language of RFRA explicitly provides a separate cause of action apart from a constitutional claim. The statute provides: "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding...." 42 U.S.C. § 2000bb–1(c). Therefore, the Court analyzes plaintiffs' RFRA claim and First Amendment claim separately according to their respective standards.

■ Here, plaintiffs' complaints clearly assert a free exercise claim, but do not cite any statutory or constitutional basis for this claim. Given that plaintiffs are proceeding pro se, the Court liberally construes their complaints. *See Estelle v. Gamble,* 429 U.S.

97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976) (a pro se complaint, "however inartfully pleaded," must be liberally construed). Accordingly, the Court assumes that plaintiffs' claims are brought pursuant to both RFRA and the First Amendment. *See Ramirez v. Coughlin,* 919 F.Supp. 617, 619 n. 1 (N.D.N.Y.1996) (although not clearly alleged in complaint, court assumes that plaintiffs' claims were brought under both RFRA and the First Amendment). In further support of this assumption is the fact that plaintiffs' response papers refer to both RFRA as well as the First Amendment.

## IV. Religious Freedom Restoration Act

■ Section 2000bb of RFRA provides that: "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in the furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1. This standard applies with equal force in the prison context. *Jolly v. Coughlin,* 76 F.3d at 475. In light of the special nature of prisons, however, courts must give due deference to the expertise of prison administrators in establishing necessary regulations and practices to maintain institutional order and security. *Id.* at 475–76.

Under RFRA, the threshold issue is whether plaintiffs' exercise of religion has been substantially burdened. For the purposes of this motion, defendants do not appear to contest the validity of plaintiffs' religious beliefs or plaintiffs' contention that these beliefs were substantially burdened by the strip search. Rather, defendants claim that the strip search was justified by the compelling objective of maintaining prison security following a prison disturbance in which numerous prison guards were injured.

■ It is indisputable that the interests of maintaining institutional security and preserving order are compelling. *Bell v. Wolfish,* 441 U.S. 520, 520–21, 546, 99 S.Ct. 1861, 1863–65, 1877–78, 60 L.Ed.2d 447 (1979). Moreover, defendants assert that given the

facts of this case, the strip search furthered that interest. Nonetheless, genuine questions of fact exist as to at least two issues. First, according to plaintiffs, the strip search did not further any legitimate penological interest. Plaintiffs assert that no search of the inmates was ever conducted. Instead, the inmates claim that they were forced to strip and remain standing "flesh to flesh" in a small cell as a form of humiliation. Second, even assuming the search did advance the Government's interest in institutional security, plaintiffs raise the factual issue of whether Captain Hurrey's refusal to separate them in accordance with their religious beliefs was the least restrictive means of effectuating this interest. Defendants have neither alleged nor established that under the facts of this case, the simultaneous strip search of approximately forty-four inmates was the least restrictive means available of ensuring prison safety and security. In their complaints, plaintiffs allege that they asked to be separated before removing their clothes, but were either ignored or threatened in response. Defendants may ultimately establish that in light of the surrounding circumstances, the safety of inmates or prison officials would have been threatened had the four plaintiffs been taken to a separate area to be searched. Such a determination is properly left to the trier of fact.

Therefore, assuming plaintiffs' allegations to be true, as the Court must on this motion for summary judgment, the Court cannot say as a matter of law that the conduct at issue furthered a compelling government interest. Similarly, even assuming that Captain Hurrey's order to strip did advance an important state interest, a genuine issue of fact exists regarding whether the group strip search was the least restrictive means by which prison officials could effectively inspect the inmates for concealed contraband or injury.

## V. First Amendment

■■■ Regulations that infringe upon a prisoner's First Amendment rights must pass a reasonableness test. *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64 (1987); *O'Lone v. Estate of Shabazz,* 482 U.S. at 353, 107 S.Ct. at 2406–07. In both *Turner* and *O'Lone,* the Su-

preme Court emphasized that in analyzing the constitutionality of prison regulations, courts should apply the less stringent reasonableness standard, rather than strict scrutiny, in order to ensure that "courts afford appropriate deference to prison officials" and permit the officials "to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *O'Lone v. Estate of Shabazz,* 482 U.S. at 349, 107 S.Ct. at 2405 (quoting *Turner v. Safley,* 482 U.S. at 89, 107 S.Ct. at 2261–62). Specifically, the Court considers four factors in determining whether a prison regulation is rationally related to a legitimate penological interest: (1) whether there is a legitimate rational connection between the prison regulation and the government interest; (2) whether the prisoners have alternative means of exercising the constitutional right at issue; (3) the impact that accommodation of the constitutional right would have on other inmates, guards, and prison resources in general; and (4) the availability of alternatives to the regulation. *Turner v. Safley,* 482 U.S. at 89–90, 107 S.Ct. at 2261–62. The policy or conduct at issue need not be the least restrictive; rather, absent evidence demonstrating that prison officials exaggerated their response to security issues, their expert judgment should be accepted by the Court. *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977); *Hurley v. Ward,* 549 F.Supp. 174, 183 (S.D.N.Y.1982).

■■■ As discussed above, defendants assert that the strip search was reasonable to ensure the security of the facility. The Court has already determined, however, that a genuine issue of fact exists as to whether the strip search was reasonable given plaintiffs' allegation that they were never actually searched, visually or physically. Similarly, defendants have not established that the simultaneous strip search of plaintiffs with other inmates was reasonable in light of plaintiffs' allegations that (1) on other occasions Muslim inmates had been searched separately; and (2) approximately fifteen guards were present when the inmates were ordered to remove their clothes.

■ The district court's decision in *Hurley v. Ward*, 549 F.Supp. 174 (S.D.N.Y.1982), relied upon by defendants, supports this Court's finding. In *Hurley*, the court upheld the prison policy of conducting strip searches of all inmates, including Muslims, after contact visits. The court refused, however, to uphold the practice of strip searches as a routine matter after non-contact visits or prison transfers, finding that strip searches at these times served no legitimate penological purpose. *Id.* at 186.[6] Similarly, in the present case plaintiffs claim that the search served no legitimate purpose but was instead conducted in order to humiliate and degrade the inmates. As such, plaintiffs' First Amendment claims cannot be dismissed pursuant to Rule 56.[7]

## VI. Eighth Amendment

### A. The Strip Search [8]

■ Plaintiffs' allegation that the strip search constituted cruel and unusual punishment does not fall neatly within either of the two categories of cases in which inmates usually allege Eighth Amendment violations. Specifically, plaintiffs neither allege (1) that the officers used excessive force in conducting the strip search; nor (2) that the officers denied them basic human needs, such as food, medical care or safety. *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 831–33, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994). Rather, plaintiffs claim that by forcing them to strip in a room full of inmates for no legitimate purpose and in violation of their Muslim principles, defendants inflicted cruel and unusual punishment upon them. Although such claims are more commonly brought under the Fourth Amendment, the manner in which a strip search is conducted may in certain circumstances give rise to an Eighth Amendment claim. *See Frazier v. Ward*, 426 F.Supp. 1354, 1366 (N.D.N.Y. 1977) (body cavity search "conducted in a debasing manner and not for any genuine security purposes" constituted cruel and unusual punishment violative of the Eighth Amendment). This case does not, however, present one of those circumstances.

Here, as in *Frazier*, plaintiffs allege that defendants conducted the strip search simply for the purpose of humiliating the inmates rather than for any legitimate penological purpose. The facts in *Frazier*, however, present a more compelling case of cruel and unusual punishment than that alleged here. First, in *Frazier*, the plaintiff was subjected to a thorough body cavity search, in which he was forced to manipulate certain body parts in order to expose all possible sources of hidden contraband to the prison guards. *Id.* at 1362–63. In the present case, on the other hand, according to plaintiffs' own testimony, no search of any kind took place, let alone a detailed body cavity search. Importantly, the Second Circuit has distinguished mere strip searches from body cavity searches, based on the severe intrusiveness of the latter. *See Security and Law Enforcement Employees v. Carey*, 737 F.2d 187, 207–08 (2d Cir.1984). Second, in *Frazier*, the undisputed testimony revealed that during these invasive searches, several guards armed with billy clubs would gather around the naked inmate and make sexually explicit comments about the inmate's body which were humiliating and derogatory. *Id.* Here, although plaintiffs claim that the guards were laughing or name-calling during the search, plaintiffs do not assert that they were subjected to the level of degrading verbal abuse present in *Frazier*. Moreover, in the instant case, plaintiffs were not subject to the

---

**6.** This finding was based on evidence indicating that contraband was very rarely found as a result of routine strip searches as compared to strip searches following contact visits. *Id.* at 185.

**7.** It is unclear whether plaintiffs also assert a Fourth Amendment claim based on the alleged unreasonableness of the strip search. To the extent that such a claim is before the Court, it is subject to the same reasonableness standard as their claim under the First Amendment. *Bell v. Wolfish*, 441 U.S. at 559, 99 S.Ct. at 1884–85.

Therefore, for the reasons set forth above, the Court declines to dismiss any Fourth Amendment claim.

**8.** Although it is unclear whether plaintiffs' Eighth Amendment claim is based on the strip search or on Captain Simon's alleged use of excessive force, since plaintiffs are proceeding pro se and their complaints are to be read liberally, *see Estelle v. Gamble*, 429 U.S. at 106, 97 S.Ct. at 292, the Court will address both of these possibilities.

intimidating situation which was presented in *Frazier,* in which a single inmate was forced to undergo a highly invasive body cavity search in the presence of several guards. Finally, unlike in *Frazier,* here the search followed a prison disturbance in which numerous inmates and guards were injured. As such, the Court finds that even accepting plaintiffs' allegations as true, the search in the present case was not a punitive measure that rises to the level of "malicious and sadistic behavior." *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993) (quoting *Whitley v. Albers,* 475 U.S. 312, 320–21, 106 S.Ct. 1078, 1084–85, 89 L.Ed.2d 251 (1986)).

In addition, other courts in this circuit have held that strip searches, even if violative of the Fourth Amendment, do not necessarily run afoul of the Eighth Amendment. *See Duamutef v. Leonardo,* No. 91 Civ. 1100, 1994 WL 86700, at *5 (N.D.N.Y. March 7, 1994) (adopting Report and Recommendation in which Magistrate Judge Hurd found that plaintiff's allegation that the strip searches caused him to "suffer constant humiliation, unnecessary psychological pain and distress" did not rise to an Eighth Amendment violation). Although the court in *Duamutef* refused to dismiss plaintiff's Fourth Amendment claim based on allegedly unreasonable strip searches, it nonetheless dismissed plaintiff's Eighth Amendment claim that the searches constituted cruel and unusual punishment. *Id.* at *11. Similarly, in *Jermosen v. Coughlin,* No. 87 Civ. 6267, 1993 WL 267357, at *6 (S.D.N.Y. July 9, 1993), *aff'd,* 41 F.3d 1501 (2d Cir.1994), the court rejected an inmate's contention that the infliction of "mental pain, anguish, embarrassment and humiliation" was sufficient to establish an Eighth Amendment claim. Although the court acknowledged that psychological pain could in certain circumstances constitute cruel and unusual punishment, it found that the use of threats by prison guards in conducting the strip search was no more than de minimis psychological force and thus not actionable under the Eighth Amendment. *Id.* Therefore, the Court finds that even viewing the facts in a light most favorable to plaintiffs, they have failed to establish an Eighth Amendment claim based on the strip search.

## B. Excessive Force

 In determining whether the use of force against prisoners during the course of a prison disturbance violates the Eighth Amendment, the core judicial inquiry is whether the force was applied "in a good faith effort to maintain or restore discipline or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 1–2, 112 S.Ct. 995, 996, 117 L.Ed.2d 156 (1992). Specifically, the Court must evaluate both the objective and subjective components of the alleged violation. In the excessive force context, the objective component relates to the seriousness of the injury. *Davidson v. Flynn,* 32 F.3d 27, 29–30 (2d Cir.1994). Thus, the extent of injury suffered by the plaintiff is a relevant, but not dispositive factor in determining whether the force used was unconstitutional. *Hudson v. McMillian,* 503 U.S. at 1–2, 112 S.Ct. at 996–97. In addition, the Eighth Amendment does not reach de minimis uses of physical force. *Id.* at 2, 112 S.Ct. at 996–97. The subjective component relates to whether defendants had a "wanton" state of mind when they engaged in the alleged misconduct. *Davidson v. Flynn,* 32 F.3d at 30. In evaluating whether the use of force was wanton or unnecessary, the Court considers the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the officials, and any efforts made to temper the severity of a forceful response. *Hudson v. McMillian,* 503 U.S. at 7, 112 S.Ct. at 999. Finally, because prison disturbances require prison officials to act "quickly and decisively," the Courts affords them "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 6, 112 S.Ct. at 999 (quoting *Bell v. Wolfish,* 441 U.S. at 547, 99 S.Ct. at 1878).

 Here, it is undisputed that Captain Simon's alleged use of force against Johnson occurred during or immediately after the prison disturbance. It is also undisputed that the alleged force consisted of Captain Simon pushing Johnson against the wall or from one wall to another with his hands and

with no weapons. Moreover, a medical examination of Johnson revealed no broken bones, bruises or swelling. Investigative Supervisor's Report, dated June 26, 1992, annexed to the Waldron Decl. as Exh. "5." As such, the Court finds that this level of force is de minimis and thus not protected by the Eighth Amendment. *See Candelaria v. Coughlin,* 787 F.Supp. 368, 374–75 (S.D.N.Y.) (where officer allegedly pushed his fist against inmate's neck so inmate could not move or breathe, court found only de minimis use of force since officer did not use force repeatedly and no bruises or swelling resulted), *aff'd,* 979 F.2d 845 (2d Cir.1992).

 Even if this level of force were more than de minimis, Captain Simon's conduct and Johnson's corresponding injuries were not serious enough to satisfy the objective component of the Eighth Amendment. Captain Simon is alleged only to have pushed Johnson against the wall with his hands. As Judge Friendly recognized, "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom. John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973); *see also Gabai v. Jacoby,* 800 F.Supp. 1149, 1155 (S.D.N.Y.1992) (Eighth Amendment claim dismissed on summary judgment where officer, in attempting to restore order, allegedly pushed inmate into chair causing a bruise on inmate's arm). In any event, not only were Johnson's injuries minor, but were also more likely caused by the riot squad officer, whom Johnson claims hit him several times with a stick, as opposed to Captain Simon, who is alleged only to have pushed Johnson against the wall.

Finally, the record is devoid of evidence that in pushing Johnson, Captain Simon acted in a wanton manner. Johnson has neither alleged nor attempted to establish that Captain Simon exhibited "malicious and sadistic behavior." *Romano v. Howarth,* 998 F.2d at 105 (quoting *Whitley v. Albers,* 475 U.S. at

320–21, 106 S.Ct. at 1084–85). The force allegedly used by Captain Simon was reasonable in light of the circumstances and the threat reasonably perceived by him.[9]

## VII. Qualified Immunity

 Government officials performing discretionary functions are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Qualified immunity allows courts to terminate meritless lawsuits quickly and reduces litigation expenses and the deterrence of citizens from accepting positions in public office. *Id.* at 814, 102 S.Ct. at 2736. If, however, facts material to the issue of qualified immunity are in dispute, claims cannot be dismissed based on qualified immunity as a matter of law before trial. *DiMarco v. Rome Hospital,* 952 F.2d 661, 666 (2d Cir.1992). In other words, "if any reasonable trier of fact could find that the defendants' actions were objectively unreasonable, then the defendants are not entitled to summary judgment." *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995).

 In the present case, the core inquiry is whether a reasonable prison official would have believed that the group strip search and the refusal to separate the Muslim inmates violated RFRA, the First Amendment or the Fourth Amendment. As discussed above, a material issue of fact exists as to whether the manner in which the search was conducted was objectively unreasonable and thus violative of the First and Fourth Amendments. Since this fact is material to the determination of qualified immunity, summary judgment on plaintiffs' First and Fourth Amendment claims cannot be granted on qualified immunity grounds.

 Whether a reasonable prison official would have believed that the strip search of plaintiffs with the other inmates violated

---

9. Notably, the disturbance that led to the strip search began when an inmate who was told to face the wall in order to be handcuffed unexpectedly turned around and assaulted Captain Whitehead. Use Of Force Report prepared by Captain Whitehead, dated June 15, 1992, annexed to the Waldron Decl. as Exh. "4," at ¶ 6. It was this incident that precipitated other altercations between surrounding inmates and officers.

**194**

RFRA presents a different question. On a motion for summary judgment on qualified immunity grounds, the Court must not only assess the "objective legal reasonableness" of defendants' actions, but must also consider whether the legal rule at issue was "clearly established" at the time the actions were taken. *Harlow v. Fitzgerald,* 457 U.S. at 818–19, 102 S.Ct. at 2738–39. If the law under which plaintiffs' claims are brought was not clearly established at the time the defendants acted, the defendants cannot be said to know that the law forbade their actions. *Gilmore–Bey v. Coughlin,* 929 F.Supp. 146, 150 (S.D.N.Y.1996). Although RFRA applies retroactively to the conduct at issue here, which occurred in 1992, *see Reese v. Coughlin,* No. 93 Civ. 4748, 1996 WL 374166, at *5 (S.D.N.Y. July 3, 1996), the statute was not passed until November 1993. As held in *Woods v. Evatt,* 876 F.Supp. 756, 771–72 (D.S.C.), *aff'd,* 68 F.3d 463 (4th Cir. 1995):

> The RFRA was clearly a change in the law and was a clear and determined break from the interpretation of that law by the Supreme Court and the appellate courts. As its legislative history makes clear, the law was intended to change the standard under which claims of religious freedoms and/or discrimination were considered.

Therefore, as in *Gilmore–Bey v. Coughlin,* 929 F.Supp. at 150, defendants here are "clearly entitled to qualified immunity for acts taken prior to the effective date of the statute, November 16, 1993." Plaintiffs' claims pursuant to RFRA are thus dismissed on the ground that defendants are entitled to qualified immunity.

### CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 is granted as to (1) all claims against Warden Patterson and Captain Whitehead; and (2) plaintiffs' claims pursuant to the Religious Freedom Restoration Act and the Eighth Amendment. Defendants' motion for summary judgment is denied as to plaintiffs'

claims pursuant to the First and Fourth Amendments.

SO ORDERED.